UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

UNITED STATES SECURITIES AND          )
EXCHANGE COMMISSION,                   )
                                       )
        Plaintiff,                     )
                                       )
             v.                        )     Case No. 1:18-cv-00954-CCR
                                       )
GRENDA GROUP, LLC and                  )
GREGORY M. GRENDA,                     )
                                       )
        Defendants.                    )

**OPINION AND ORDER**
**GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
(Doc. 61)

Plaintiff United States Securities and Exchange Commission (the "SEC") brings this suit pursuant to Section 209(d), (e), and (f) of the Investment Advisers Act of 1940 (the "Advisers Act") against Defendant Grenda Group, LLC ("Grenda Group") and Defendant Gregory M. Grenda ("G. Grenda") (collectively "Defendants")[1] for violations of Sections 203(f), 206(1), and 206(2) of the Advisers Act. Plaintiff alleges five causes of action: violation of Section 203(f) of the Advisers Act against Grenda Group and G. Grenda (Count I); aiding and abetting in violation of Section 203(f) against G. Grenda (Count II); violation of Section 206(1) of the Advisers Act against Grenda Group and G. Grenda (Count III); violation of Section 206(2) of the Advisers Act against Grenda Group and G. Grenda (Count IV); and aiding and abetting in violation of Sections 206(1) and (2) against G. Grenda (Count VI).

Pending before the court is the SEC's motion for partial summary judgment with regard to Defendants' violations of Section 203(f), as set forth in Counts I and II of its Complaint. (Doc. 61.) Defendants opposed the motion on September 25, 2020. The SEC

---

[1] This court entered a final judgment against Walter Grenda ("W. Grenda") on December 3, 2018. At that time Walter Grenda was terminated as a Defendant. (Doc. 22.)

filed its reply on October 16, 2020. The court held a hearing on October 30, 2020, at which time it took the pending motion under advisement.

The SEC seeks summary judgment on its claim that Defendants violated Section 203(f) of the Advisers Act which provides in relevant part:

> It shall be unlawful for any person as to whom such an order suspending or barring him from being associated with an investment adviser is in effect willfully to become, or to be, associated with an investment adviser without the consent of the Commission, and it shall be unlawful for any investment adviser *to permit* such a person to become, or remain, a person associated with him without the consent of the Commission, if such investment adviser knew, or in the exercise of reasonable care, should have known, of such order.

15 U.S.C. § 80b-3(f) (emphasis supplied).

The SEC also seeks summary judgment on its claim that G. Grenda aided and abetted the Grenda Group's violation of Section 203(f). Under Section 209(f) of the Advisers Act, "any person that knowingly or recklessly has aided, abetted, counseled, commanded, induced, or produced a violation of any provision of this subchapter . . . shall be deemed to be in violation of such provision . . . to the same extent as the person that committed such violation." 15 U.S.C. § 80b-9(f).

The SEC is represented by David P. Stoelting, Esq., Barry Patrick O'Connell, Esq., Judith Ann Weinstock, Esq., Marc P. Berger, Esq., Maureen Peyton King, Esq., and Sanjay Wadhwa, Esq. Defendants are represented by Joseph G. Makowski, Esq.

## I.    The Record Before the Court.

In addition to contesting certain facts identified by the SEC, Defendants seek to supplement the record with additional facts. The SEC, in turn, has responded to Defendants' proffer of additional facts, admitting some and disputing others. Although neither the Federal Rules of Civil Procedure nor this court's Local Rules authorize this practice, in light of the parties' joint adaptation of this approach, the court has included the additional facts, to the extent they are material, for purposes of the record on summary judgment. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582

F.3d 244, 264 (2d Cir. 2009) ("A district court deciding a summary judgment motion 'has broad discretion in choosing whether to admit evidence.'").

Defendants assert that the court should assign the Declaration of Elzbieta Wraga (the "Wraga Declaration") no weight because the telephone records summarized in the Wraga Declaration are devoid of content and simply reflect the number of phone calls and text messages between W. Grenda and Grenda Group clients, which Defendants contend reflect personal calls or calls related to W. Grenda's tax services. The SEC counters that the Wraga Declaration establishes that Defendants permitted W. Grenda to use a Grenda Group cell phone to communicate with Grenda Group clients thousands of times after W. Grenda's July 31, 2015 SEC bar and after Defendants knew W. Grenda had impersonated G. Grenda in making calls to Charles Schwab in violation of the SEC bar.

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. "Determinations of relevance are entrusted to the sound discretion of the district court" and "[t]he standard for determining relevance is a liberal one." *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 419 (S.D.N.Y. 2011). "On a motion for summary judgment, barring substantial cause for excluding evidence on relevance grounds, a court should admit and consider the challenged exhibits and testimony." *Id.* Even evidence that "may be of limited probative value" cannot be ignored on summary judgment. *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 71 (2d Cir. 2000) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 112 (2d Cir. 1997)).

Because the Wraga Declaration is probative of whether Defendants permitted W. Grenda to contact Grenda Group clients notwithstanding his barred status, whether Defendants monitored those communications, and whether Defendants permitted them to continue even after they knew W. Grenda had impersonated G. Grenda while making investment inquiries to Charles Schwab, Defendants' request to exclude the Wraga Declaration on relevancy grounds is DENIED.

Defendants next argue opinions provided in Arthur B. Laby's expert witness report are inadmissible: (1) because any evidence of G. Grenda's failure to disclose W. Grenda's bar to Grenda Group clients is irrelevant; and (2) because Mr. Laby's report contains an ultimate legal conclusion regarding whether Defendants "permitted" W. Grenda to associate with them. (Doc. 81 at 31) (internal quotation marks omitted). With respect to Defendants' first argument, Defendants argue G. Grenda's failure to disclose W. Grenda's bar to Grenda Group clients is not relevant because G. Grenda was under no duty to disclose it and the SEC's Complaint contains no allegations of fraud or deception.

The Advisers Act "concerns itself with investment advisers, who, as fiduciaries, have a duty to disclose material information to clients." *SEC v. Washington Inv. Network*, 475 F.3d 392, 404 (D.C. Cir. 2007). Courts have therefore found it relevant whether an SEC bar is disclosed in a Section 203(f) violation case. *See id.* at 402-03 (finding it relevant that the defendants did not "take formal steps . . . to inform . . . clients of the bar order, along with an explanation of how the bar order might affect their interests and a neutral discussion of the options these clients might have"). Accordingly, to the extent Mr. Laby opines regarding the significance of a failure to disclose the SEC bar to Grenda Group clients, Defendants' relevancy challenge to this evidence is DENIED.

Defendants fare better with their second argument that Mr. Laby's opinion regarding whether Defendants "permitted" W. Grenda to associate with them improperly offers a legal conclusion. An expert witness opinion that offers a conclusion of law usurps the judge's role and is inadmissible. *See Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) (holding that "expert testimony that expresses a legal conclusion" must be excluded); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (holding "although an expert may opine on an issue of fact within the jury's province, he [or she] may not give testimony stating ultimate legal conclusions based on those facts"). This conclusion applies with equal force to the declaration of G. Grenda wherein he avers that W. Grenda "did not associate with Grenda Group after the initiation of his SEC bar on July 31, 2015, nor did Grenda Group or I permit [W. Grenda] to associate with Grenda Group for investment activities[,]" (Doc. 75 at 12, ¶ 66) as well as to W. Grenda's

4

declaration that he "did not associate with Grenda Group after the initiation of [his] bar on July 31, 2015, nor did [G.] Grenda or Grenda Group permit [him] to associate[.]" (Doc. 76 at 13, ¶ 74.) The court therefore GRANTS Defendants' request to exclude Mr. Laby's opinion to the extent it offers a conclusion of law.

Finally, Defendants contend that pre-bar date facts are not relevant to the SEC's motion for partial summary judgment because only what happened thereafter could support a violation of Section 203(f) and an aiding and abetting claim. While this is true, it advocates for too narrow an approach to relevancy and ignores the close association between W. Grenda, G. Grenda, and the Grenda Group that pre-dated the SEC bar. As the SEC point out, the pre-bar facts support a conclusion that W. Grenda and G. Grenda represented themselves as investment adviser associates before the July 31, 2015 bar date and did not advise their joint clients that they were severing all business relationships between them after the bar date. They also did not affirmatively notify Grenda Group clients of W. Grenda's banned status. Because pre-bar date facts place Defendants' acts and omissions in a factual context relevant to a determination of whether they permitted association with W. Grenda in violation of Section 203(f), Defendants' request to exclude this evidence is DENIED.

## II.  The Undisputed Facts.

### A.  Walter Grenda and Reliance.

In 1989, W. Grenda founded Reliance Financial Advisors, LLC ("Reliance"), a Buffalo, New York-based investment adviser whose office was located at 2819 William Street, Buffalo, New York. Reliance became registered with the SEC in January 2011. W. Grenda was Reliance's president and was also an investment adviser who passed the following securities industries licensing examinations: the Series 7 (General Securities Representative) in January 1981; the Series 24 (General Securities Principal) in February 1986; the Series 65 (Uniform Investment Adviser Law) in February 2007; and the Series 63 (Uniform Securities Agent State Law) in April 1984.

In approximately May 2013, the Financial Industry Regulatory Authority ("FINRA") began investigating an investment, Prestige Wealth Management Fund LP

(the "Prestige Fund"), recommended by W. Grenda to Reliance clients. In May and July 2013, W. Grenda gave sworn testimony as part of the FINRA investigation. On July 26, 2013 and May 9, 2014, W. Grenda received document subpoenas from SEC staff. On June 17, 2014, W. Grenda received a "Wells" notice informing him that SEC staff had "made a preliminary determination to recommend that the [SEC] file an enforcement action against [him,]" alleging that he had violated, aided and abetted, and/or caused violations of Section 17(a) of the Securities Act of 1933 (the "Securities Act"); Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"); and Rule 10b-5 and/or Sections 204, 206 (1), (2), and (4) of the Advisers Act and Advisers Act Rules 204-1, 204-2, and 206(4). (Doc. 64 at 5) (internal quotation marks omitted).

On December 14, 2014, the SEC commenced an administrative proceeding by issuing an "Order Instituting Administrative Cease-And-Desist Proceedings" pursuant to Section 8A of the Securities Act, Sections 15(B) and 21C of the Exchange Act, Sections 203(e), (f), and (k) of the Advisers Act, and Section 9(B) of the Investment Company Act of 1940, where it alleged that W. Grenda "knowingly or recklessly made or used false and misleading statements to [his] advisory clients in order to create the false appearance that an investment in the Prestige Fund was less risky than it really was" and that in late 2009, he "borrowed $175,000 from two of his advisory clients (a mother and a daughter), telling them that he would use the loan to grown his business[,]" which he used to, "among other things, pay personal expenses and debts." (Doc. 80 at 6, ¶ 19) (internal quotation marks omitted). The SEC asserted that W. Grenda had willfully violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Section 206(1) and (2) of the Advisers Act and had aided and abetted Reliance's violations. Also on December 10, 2014, FINRA's Department of Enforcement commenced a disciplinary proceeding against W. Grenda, alleging that he had fraudulently induced Reliance customers to invest in the Prestige Fund and had "lied" to FINRA investigators about borrowing money from a customer. *Id.* at 7, ¶¶ 21-22 (internal quotation marks omitted).

On July 31, 2015, the SEC issued an "Order Making Findings and Imposing

Remedial Sanctions and a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933, Sections 15(b) and 21C of the Securities Exchange Act of 1934, Sections 203(e), 302(f) and 203(k) of the Investment Advisers Act of 1940, and Section 9(b) of the Investment Company Act of 1940" (the "Cease and Desist Order"). In the Cease and Desist Order, the SEC made findings, which W. Grenda neither admitted nor denied, that W. Grenda "made or disseminated to his advisory clients materially false and misleading statements" in marketing the Prestige Fund and had "made false and misleading statements and omissions to two advisory clients" in order to borrow funds from them." (Doc. 80 at 8, ¶ 25) (internal quotation marks omitted).

In the Cease and Desist Order, the SEC further found that W. Grenda and Reliance had violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b5 thereunder, and Sections 206(1) and (2) of the Advisers Act and had aided and abetted violations of these statutes by Reliance and the Prestige Fund. The SEC imposed a number of sanctions, including censuring Reliance and revoking its registration as an investment adviser and ordering W. Grenda to pay a disgorgement fee of $25,000 and civil penalties of $50,000. As a result of the Cease and Desist Order, as of the July 31, 2015 bar date:

> [W. Grenda] was barred from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization; prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter; and barred from participating in any offering of a penny stock, including: acting as a promoter, finder, consultant, agent or other person who engages in activities with a broker, dealer or issuer for purposes of the issuance or trading in any penny stock, or inducing or attempting to induce the purchase or sale of any penny stock; with the right to apply for reentry after three (3) years to the appropriate self-regulatory organization, or if there is none, to the [SEC.]

*Id.* at 9, ¶ 27. W. Grenda did not seek reentry after the bar date.

On February 11, 2016, FINRA issued an Order Accepting Offer of Settlement in

which W. Grenda was "barred from association with any FINRA member in any capacity." *Id.* at ¶ 29 (internal quotation marks omitted). G. Grenda became aware that W. Grenda, his father, was barred by the SEC "shortly after . . . it occurred[.]" (Doc. 61-16 at 15.)

### B.    Formation of Grenda Group and G. Grenda's Involvement.

Starting in 2008, G. Grenda, who took courses but did not graduate from college, was employed as an intern at Reliance until 2010, eventually working his way up to the position of W. Grenda's assistant. In April 2012, he passed his Series 7 (General Securities Representative) examination, and in January 2014, he passed his Series 66 (Uniform Combined State Law) examination. From April 2012 to February 2014, G. Grenda was an investment adviser at Reliance.

W. Grenda decided to sell Reliance because he "certainly didn't think a good outcome was going to come out of" the pending SEC investigation and because he always intended for G. Grenda to succeed him in his business. (Doc. 80 at 11-12, ¶ 38) (internal quotation marks omitted). G. Grenda testified that he "saw everything [his] father was going through, [and] decided that it was an opportunity for [him] to purchase the business and start [his] own." (Doc. 61-16 at 12.)

In an Asset Purchase Agreement dated February 1, 2014 between W. Grenda, as seller, and the Grenda Group, as purchaser, Grenda Group acquired the assets of Reliance, which included all of Reliance's customers, for a purchase price of $1,780,000. A Promissory Note in the amount of $2 million was executed the same day by G. Grenda on behalf of Grenda Group and personally guaranteed by G. Grenda. It provided that Grenda Group would pay W. Grenda monthly installments of $15,000, together with interest at a rate of ten percent per annum. Although real property located at 2819 William Street was included in the Asset Purchase Agreement, it was not transferred to the Grenda Group or to G. Grenda because that property served as collateral for a loan owed by W. Grenda. Grenda Group instead became a lessee of office space at 2819 William Street, the former office of Reliance.

Since January 2014, G. Grenda has been the owner, Chief Compliance Officer,

and sole member of Grenda Group, a limited liability company created under New York law. On January 21, 2014, Grenda Group became an investment adviser registered with the SEC. As the principal of Grenda Group, G. Grenda is also considered an investment adviser.

### C.   W. Grenda Forms, Owns, and Operates GWM.

In 2014, W. Grenda formed Generational Wealth Management ("GWM") to assist clients in making "the most of their financial situation . . . [b]y looking at all financial transactions[]" and making recommendations and by preparing tax returns. (Doc. 62-4 at 9.) The GWM office was also located at 2819 William Street, Buffalo, New York. Upon selling Reliance, W. Grenda testified that he told clients he was "not going out to pasture [and] was going to begin doing taxes and things of that nature" and had "every intention of staying updated with the clients" through GWM. (Doc. 80 at 13, ¶ 41) (internal quotation marks omitted).

The vast majority of Grenda Group's clients had previously been Reliance clients and were both "long-standing clients" as well as personal friends of W. Grenda. *Id.* at ¶ 43 (internal quotation marks omitted). These Reliance clients had known G. Grenda "since he's been a boy[.]" *Id.* at ¶ 42 (internal quotation marks omitted). W. Grenda had a "very intimate relationship with all the customers" and they did not "hesitate to talk to him about anything" and "don't financially sneeze without checking with [him]." *Id.* at 14, ¶ 45 (internal quotation marks and alterations omitted).

### D.   W. Grenda and Grenda Group Communications Pre-Bar Date.

In March 2014, a letter on Grenda Group letterhead was sent by W. Grenda informing clients that he had decided to transfer the "day-to-day business management responsibilities" of Reliance to G. Grenda and the Grenda Group as part of "the ongoing growth of Reliance[,]" *id.* at 15, ¶ 48 (internal quotation marks omitted), and that he had "sold Reliance . . . to [his] son, G[.] Grenda[]" and G. Grenda would "assume the day-to-day management of the practice responsible for operations, execution, and compliance." (Doc. 63-5 at 31.) W. Grenda explained that the transition "will enable me to fully concentrate on investment and market research, risk management and portfolio

management techniques" and further stated that "your current investments and the way your accounts are managed will not be affected by this transition." (Doc. 80 at 15, ¶ 48) (internal quotation marks omitted). The letter informed Grenda Group clients they could reach W. Grenda at his cell phone number ending in 6234 but asked that they contact him "after 4 pm to allow for my undivided attention on the markets" and noted that he "look[ed] forward to sharing in our continued relationship and successes for many years to come." *Id.* at ¶ 49 (internal quotation marks omitted).

In 2014, both W. Grenda and G. Grenda sent client letters on Grenda Group letterhead, sometimes co-signing the letter and identifying W. Grenda as the firm's "Market Strategist" and G. Grenda as the "Chief Operating Officer." *Id.* at ¶ 48 (internal quotation marks omitted). In an October 2014 "Dear Clients" letter on Grenda Group letterhead, W. Grenda and G. Grenda offered suggestions "to properly assess your investment performance." *Id.* at 16, ¶ 50 (internal quotation marks omitted). The "Dear Clients" letter was signed by G. Grenda as Grenda Group's "Chief Operating Officer" and identified W. Grenda as Grenda Group's "Marketing Strategist."

On April 25, 2014 W. Grenda wrote to a client:

> FYI, I'm going to be shutting Reliance Financial down and literally resigning from being registered for numerous reasons but the most important being the lack of regulations (in a[n] ever growing regulatory environment) that frees me to openly communicate with clients, friends & family via social media, etc. . . . Bottom line it's in everyone's best interest to have me focused without interruption when the markets are open.

*Id.* at 17-18, ¶ 54 (internal quotation marks omitted).

### E.   W. Grenda's Communications with Grenda Group Clients After the Cease and Desist Order and July 31, 2015 Bar Date.

On August 11, 2015, W. Grenda emailed a Grenda Group client informing him that "I charge $300.[00] for a complete estate plan and apply a $50.[00] discount for being a Grenda Group client and a $50.00 discount for payment in cash." (Doc. 62-18 at 1.) On October 8, 2015, W. Grenda emailed another Grenda Group client stating G. Grenda "is editing a market update now and will email[ it] out soon but the essence of the message is risks abound with a hedge (SDS) and an exit strategy (profit taking or go to

cash) is critical . . . [I']d like to reach out to Jack, your thoughts?" (Doc. 62-19 at 1.)

On September 28, 2015, W. Grenda called Charles Schwab, stating, "I'm in Buffalo, and I have a problem allocating. I was trying to get ahold of trading." (Doc. 80 at 25, ¶ 76) (internal quotation marks omitted). When asked for his name, he responded "Greg Grenda." *Id.* (internal quotation marks omitted). In a call placed on November 9, 2015, W. Grenda called Charles Schwab and identified himself as "Greg Grenda" and asked for "performance information about [Vantage Investment Advisors'] offerings." *Id.* at 26, ¶ 77 (internal quotation marks omitted). The Charles Schwab representative recommended that he call Vantage Investment Advisors directly, and W. Grenda responded by asking, "I would rather stay anonymous. Is there any way of doing it?" *Id.* (internal quotation marks omitted). On May 26, 2016, W. Grenda called Charles Schwab, impersonated G. Grenda, and requested client information on Renee Weisgold. The Charles Schwab representative informed him that "the distribution would process the next day unless the client signed a form to authorize a wire," and W. Grenda responded "I'll call you back. But at least it's going out tomorrow morning?" *Id.* at 27 (internal quotation marks omitted).

When the Charles Schwab impersonation calls were made from W. Grenda's 6234 cell phone number, G. Grenda claims he had no knowledge that his father was impersonating him or making investment-related calls and was not sure that W. Grenda had done so. In August 2016, G. Grenda asserts that he learned that W. Grenda had impersonated him. Within forty-five minutes of learning of the calls from the 6234 number, G. Grenda confronted his father; secured key fobs used by his father to log into the Charles Schwab system; changed the locks to Grenda Group's office; and contacted AT&T, Grenda Group's telephone service provider, and removed W. Grenda's cell phone number ending in 6234 from Grenda Group's plan. At that point, G. Grenda did not tell anyone else about the impersonated calls. After August 2016, W. Grenda used a cell phone number ending in 1886. At all times from 2014 to 2018, the cell phones used by W. Grenda were part of Grenda Group's services and paid for through Grenda Group's company account. W. Grenda was removed from the plan entirely in August 2018. Even

after W. Grenda had impersonated him, in 2015, G. Grenda sent clients a holiday card signed by G. Grenda, W. Grenda, Amanda, and MaryAnn.

On June 13, 2016, W. Grenda responded to an email from a Grenda Group client stating:

> [w]e can actively manage both accounts at a tax-deductible $500.[00] (or 1% of total value of all account, whichever is greater) annual fee, payable to Grenda Group" and "please send the website and log-in information for both of your employer-sponsored savings plans . . . We can actively manage both accounts[.]

(Doc. 63-1 at 1; Doc. 80 at 18, ¶ 55) (internal quotation marks omitted). W. Grenda added: "I reviewed your income tax returns." *Id.* (internal quotation marks omitted).

A few days later, on July 18, 2016, W. Grenda emailed a Grenda Group client, writing, "I logged in to your TSP and made some changes to better reflect the volatility and uncertainty in the markets. I continue to be cautiously optimistic and feel being more conservative is more appropriate at this time. Call me with any questions." (Doc. 63-2 at 1.) Also in 2016, G. Grenda sent an email to a Grenda Group client wherein he stated that Reliance was rebranding by changing its name to Grenda Group.

In an April 2017 email exchange, a Grenda Group client directed an email to W. Grenda, writing, "Walter, Will give 50k[,]" and G. Grenda responded, "This is Greg Grenda. I will relay your message to Walter." (Doc. 63-3 at 1.) G. Grenda asserts that he had no idea what the message meant.

In 2017, W. Grenda made the decision that Grenda Group clients would use W. Grenda and GWM to prepare their tax returns. *See* Doc. 80 at 17, ¶ 53 (W. Grenda testified: "It was actually me who made that decision, from the standpoint that—you know, those customers were—those customers would come to me") (internal quotation marks omitted).

Stephanie Tjhung, a Grenda Group client who was a client of W. Grenda for twenty-five years, was not informed about the Cease and Desist Order or the SEC bar. Ms. Tjhung received letters explaining that Grenda Group decided to move from TDA to Schwab and then from Schwab to Interactive Brokers.

On June 4, 2018, a Grenda Group client sent the following email to G. Grenda's email address:

> Hi Walt,
>
> I'm visiting my daughter in Chicago and this is the only contact information I have for you. I need to check and see if there is enough money in the brokerage account to loan her family $12,000. . . . So could you please let me know what the brokerage account looks like. . . . Thanks and I hope you,[ ]Mary Ann and Greg are well.

(Doc. 63-4 at 1.)

On August 31, 2018, G. Grenda told a Grenda Group client that he "made the SEC fully aware that my father would continue to do estates and taxes, but also that he had formed friendships with many of the clients over the years" and "[t]hat is something beyond my control." (Doc. 80 at 14, ¶ 46.)

Although Defendants correctly point out that G. Grenda is not copied on the majority of the communications W. Grenda sent to Grenda Group clients, he was an email recipient of a series of emails in November 2015 from Edwin B. Hubbard which posed investment questions to both G. Grenda and W. Grenda and which indicated Mr. Hubbard's "understanding in speaking with [G. Grenda] was that we 3 would have a discussion about SWAN [an investment rating system]" (Doc. 62-20 at 1) and telling "Walter" "[t]his is why I question the track record of SWAN and why I continue to look at index funds and wonder 'would we be better off in the long run by leveraging across multiple index funds?'" *Id.* In this email chain, W. Grenda stated: "Per our discussion, although it seems unlikely that we will be able to get a decent premium on RAI as it closed at 45 today, if you can get a decent premium and do a CC at 45 and do a buy to close, go for it." *Id.* at 3. On November 15, 2015, W. Grenda sent Edwin Hubbard an email in which he wrote:

> [Y]es the next report will be UR (under review) that includes stocks identified as strong buys and because, at the time, were trading well above support (buy price), [I] would track them . . . [I] also put stocks on the UR list when [I] feel their sector is out of favor . . . my thinking is that we review the rating system (using the spreadsheet [I] already sent you) and then move onto UR report, then onto UW (under watch), INC (income-

oriented stocks), CC (covered call possibilities) and SS (special situations,
like shorting a [stock] – for example, we spoke while playing golf about
shorting Green Mtn. Coffee Roasters[.]

(Doc. 62-20 at 2.) In addition to G. Grenda's receipt of these emails, Mr. Hubbard
emailed draft comments intended for "Walter" but which he indicated he wanted G.
Grenda to review in anticipation of their discussion of investment strategies.

According to the Wraga Declaration, after July 31, 2015, call logs for W. Grenda
using a Grenda Group cell phone reflect 1,767 outgoing calls to Grenda Group clients
that lasted thirty seconds or longer and 1,075 incoming calls from Grenda Group clients
that lasted thirty seconds or longer. W. Grenda also sent 1,700 text messages to and
received 1,517 text messages from Grenda Group clients.

W. Grenda does not dispute that he violated the SEC bar and the Cease and Desist
Order. Defendants also do not dispute that W. Grenda violated the SEC bar and the Cease
and Desist Order.

## III.    The Disputed Facts.

### A.    Formation of GWM.

Defendants assert that GWM was not formed until 2016. The SEC, however,
argues that it was formed sometime in 2014, citing emails between W. Grenda and G.
Grenda containing GWM reports for three Grenda Group clients. Defendants further
contend that GWM operated from a "separate and independent physical office and
conference room at 2819 William[] Street[.]" (Doc. 85 at 8.) The SEC disputes this
characterization because G. Grenda testified that he and his father work from the same
address and share the conference room, bathroom, fax machine, printer, coffee and
reception area, and entrance. The court finds this dispute is not material to the outcome.

### B.    W. Grenda's Interactions with Grenda Group Clients.

Defendants assert that W. Grenda communicated with Grenda Group clients
because he operated GWM, through which he provided tax and estate planning services,
and because he maintained personal relationships with former clients. Although W.
Grenda admits that he met with Grenda Group clients after July 31, 2015, he asserts that
he did so only in conjunction with GWM.

The SEC proffers affidavits from Grenda Group clients Donald Peters and Linda Fusco, who aver that after July 31, 2015, they attended meetings with both W. Grenda and G. Grenda at which W. Grenda provided investment advice in G. Grenda's presence. In his declaration, Mr. Peters stated that "I had the impression that [W. Grenda] was acting as a guide to [G. Grenda]." (Doc. 61-11 at 1.) Ms. Fusco stated in her declaration that she "recall[s] that [W. Grenda] and [G. Grenda] described each other as partners in their business[,]" and that W. Grenda "was more of the talker than" G. Grenda at a March 2016 investment discussion at which Ms. Fusco "remember[s] [W. Grenda] saying how good FitBit was as an investment, how much money they would make investing in FitBit, what a good investment it was." (Doc. 61-12 at 1-2.) In his declaration, Thomas Pollard avers that he met with W. Grenda on November 14, 2016 and was provided with investment advice and was never told of W. Grenda's SEC bar.

In his declaration, G. Grenda does not dispute that a joint meeting took place between he and his father with Ms. Fusco but avers that:

> At no time, either during a meeting on or about November 15, 2015, or ever, did I advise Ms. Fusco that [W.] Grenda and I were partners in Grenda Group and/or that both [W.] Grenda and I would be managing Ms. Fusco's IRA . . . With respect to the FitBit investment, Ms. Fusco is incorrect in her statement that [W.] Grenda recommended to her that she purchase FitBit. He did not. I made a discretionary investment in FitBit for Ms. Fusco at the end of 2015.

(Doc. 75 at 10-11, ¶ 57.) With regard to Ms. Fusco, W. Grenda denies her characterization of their meeting, however, he admits that he met with her on November 15, 2015 after G. Grenda met with her but claims he did so only to provide tax advice. *Id.* at 11, ¶ 60.

With regard to the Peters' declarations, W. Grenda admits that he met with the Peters after the SEC bar including "[o]n several occasions in 2016 and 2017," but at no time did he discuss investments with the Peters or investments in G. Grenda's presence. (Doc. 76 at 10, ¶¶ 55-56.) W. Grenda admits that he did not advise the Peters about the SEC bar but believes he had no obligation to do so. He also does not dispute that he and G. Grenda met with the Peters together.

W. Grenda acknowledges that Thomas Pollard, who resided in Canada, was a "long-time client" at Reliance and that in 2014, when Mr. Pollard wanted to make the transition to Grenda Group, he discussed possible solutions including the use of W. Grenda's home address because Charles Schwab might object to Mr. Pollard's foreign address. (Doc. 76 at 11, at ¶ 63.) He contends that Mr. Pollard was present "when [he] called Charles Schwab while in [the Pollards'] kitchen and impersonated him on the call." *Id.* at 12, ¶ 67. G. Grenda denies knowledge of W. Grenda's and Mr. Pollard's address change arrangement and asserts "[u]pon information and belief, following his bar, [W.] Grenda never met with Mr. Pollard on November 14, 2016, and gave him investment advice, or at any time thereafter[.]" (Doc. 75 at 11, ¶ 62.)

W. Grenda disputes Ms. Tjhung's contention that "[s]tarting in about 2014, . . . [her] accounts were managed by [W.] Grenda and the Grenda Group, LLC" and states he "never managed any investment account for Ms. Tjhung once she became a client of Grenda Group." *Id.* at 13, ¶ 72 (internal quotation marks omitted). G. Grenda disputes these same facts in his declaration but admits that "[i]n early 2014, Ms. Tjhung met with me and [W.] Grenda to discuss the transfer[]" of her account from Reliance to Grenda Group. (Doc. 75 at 12, ¶ 63.)

Crediting Defendants' version of the facts, it remains undisputed that W. Grenda and G. Grenda jointly met with Grenda Group clients after W. Grenda's SEC bar and at a time when no association between them was permissible. The court finds the remaining disputed facts unnecessary in determining whether summary judgment is appropriate.

In his declaration, G. Grenda asserts that after W. Grenda's SEC bar appeared in the news, he contacted, or was contacted by, many Grenda Group clients to discuss the bar and answer any questions they had. For those clients he was unable to reach, he left voice messages to call him back. He does not affirmatively state that he notified any Grenda Group clients of W. Grenda's SEC bar.

Defendants proffer declarations from Grenda Group clients Patrick Lyons, Peter Andrews, and Joseph A. Cherico, who aver that when W. Grenda and G. Grenda met with them together, W. Grenda never provided them with investment advice. These

declarations do not create a material issue of fact as to whether Defendants permitted investment advice to be provided by W. Grenda to other Grenda Group clients. They, however, provide further evidence that W. Grenda and G. Grenda continued to meet jointly with Grenda Group clients after the SEC bar.

Defendants assert that after July 31, 2015, with the exception of payments made under the Promissory Note for Reliance's assets, W. Grenda was not paid any form of compensation by Grenda Group. The SEC points to several payments made from 2014 through 2016 as evidence that Defendants' assertion is false. The documents that the SEC relies on for this assertion, Doc. 83-11 and Doc. 83-12, are both labeled "Walter Grenda Rent & Note Payments[.]" This issue is not material because it is undisputed that Grenda Group made monetary installment payments to W. Grenda pursuant to the Promissory Note.

## IV.   Conclusions of Law & Analysis.

### A.   Standard of Review.

A party is entitled to summary judgment if it can "show[] that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law" are material to the court's determination. *Id.*

At the summary judgment stage, the nonmoving party is entitled to "the benefit of all permissible inferences and all credibility assessments[.]" *SEC v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets that burden, its opponent must show that there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict" in its favor. *Anderson*, 477 U.S. at 249. However, in

opposing summary judgment, "[t]he non-moving party may not rely on conclusory allegations or unsubstantiated speculation" *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) but instead must "offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

In adjudicating a motion for summary judgment, the district court's role "is not to resolve disputed questions of fact" but to "determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted).

In this case, although certain facts are disputed, they do not preclude summary judgment if they are not material to the outcome. *See Anderson*, 477 U.S. at 247-48 ("By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). Stated differently, "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

Application of the foregoing standard to the instant case reveals that notwithstanding the existence of certain disputed facts, if the SEC can prove each essential element of its claims with undisputed evidence, it will be entitled to judgment as a matter of law in its favor.

**B.    Whether the SEC is Entitled to Summary Judgment Against Defendants for Violation of Section 203(f) of the Advisers Act (Count I).**

An investment adviser has "an affirmative duty of utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading his clients." *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 194 (1963) (internal quotation marks and footnotes omitted). That duty is

18

codified in Sections 206(1) and 206(2) of the Advisers Act which was enacted "to achieve a high standard of business ethics in the securities industry[,]" *id.* at 186, and which "was directed not only at dishonor, but also at conduct that tempts dishonor." *Id.* at 200 (internal quotation marks omitted).

To establish a violation of Section 203(f), the SEC must establish that: (1) Defendants were investment advisers; (2) Defendants knew or reasonably should have known of W. Grenda's bar from association with an investment adviser; and (3) Defendants "permitted" W. Grenda to associate with them. *Id.*

Section 202(a)(11) defines an "investment adviser" as "any person who, for compensation, engages in the business of advising others . . . as to the advisability of investing in, purchasing, or selling securities[.]" 15 U.S.C. § 80b-2(a)(11). Since January 2014, G. Grenda has been the sole owner, Chief Compliance Officer, and sole member of Grenda Group. Defendants do not dispute that both he and Grenda Group are "investment advisers." (Doc. 80 at 1-2.) As a result, the SEC may bring a Section 203(f) claim against G. Grenda as well as Grenda Group. *See SEC v. Berger*, 244 F. Supp. 2d 180, 193 (S.D.N.Y. 2001), *aff'd*, 322 F.3d 187 (2d Cir. 2003) (concluding that because he "effectively controlled [the firm] and its decision[ ]making, [the individual defendant was] also properly labeled an investment adviser within the meaning of the Advisers Act").

It is further undisputed that Defendants knew W. Grenda was subject to the Cease and Desist Order and a SEC bar shortly after the July 31, 2015 bar date. Although the term "associate" for purposes of Section 203(f) is not defined by the Advisers Act, Defendants agree that "a person associated with an investment adviser" includes persons performing clerical or ministerial functions as well as the provision of investment advice. The only contested issue is whether Defendants "permitted" W. Grenda to associate with them after the July 31, 2015 bar date.

The SEC argues that pursuant to either an active or a passive definition of "to permit," Defendants permitted W. Grenda to associate with them after the bar date through an array of acts and omissions. Focusing on only the uncontested evidence, the

SEC points out that notwithstanding a close pre-bar association whereby W. Grenda and G. Grenda worked together as investment advisers, after the bar date, Defendants did nothing to affirmatively disclose to Grenda Group clients W. Grenda's barred status. They also did nothing to prevent W. Grenda from accessing client data and firm systems which allowed him to email Grenda Group clients and offer them investment advice and change their portfolios. Defendants thus furnished and paid for the equipment, data services, and cell phone that facilitated W. Grenda's violation of the SEC bar. It was not until G. Grenda discovered that his father had impersonated him on several occasions that Defendants terminated W. Grenda's access to these data systems and cancelled the 6234 cell phone.

Even after the impersonations, Defendants continued to provide and pay for a cell phone for W. Grenda which he used to contact Grenda Group clients thousands of times. Defendants neither monitored these communications, nor did anything else to ensure that W. Grenda was not continuing to provide investment advice to Grenda Group clients. Instead, Defendants allowed W. Grenda to remain a point of contact for their clients.

Notwithstanding his claim that he was unaware of the content of his father's communications with Grenda Group clients, G. Grenda was the recipient of a series of emails wherein W. Grenda provided investment advice to Edwin B. Hubbard in November of 2015. Thereafter, he allowed W. Grenda to join him in Grenda Group client meetings and he allowed W. Grenda to make the determination that Grenda Group clients would receive tax services from GWM which operated in the same building as Grenda Group.

"The Advisers Act does not define the term 'permit' as it applies to the prohibitions detailed in Section 203(f)." *SEC v. Bolla*, 401 F. Supp. 2d 43, 61 (D.D.C. 2005), *aff'd in part & remanded sub nom., Wash. Inv. Network*, 475 F.3d 392. In *Washington Investment Network*, the D.C. Circuit held that it is enough that an "investment adviser" "took some affirmative step to permit [a barred person] to associate with [it], or at least that it acquiesced in . . . ongoing management [by the barred person] . . . such that its passivity can be deemed a violation of section 203(f)." *Id.* at 401. The

D.C. Circuit rejected a definition of "permit" that requires an affirmative grant of authority:

> Appellants argue the term "permit" in section 203(f) means "authorize," which suggests an affirmative giving of permission, as when a regulatory agency issues a license allowing a private party to engage in a regulated activity. The SEC rejects this narrow reading of the word "permit," interpreting the word to mean, in effect, "acquiesce." We think the SEC's reading of the statute is correct. If Congress in adopting section 203(f) used the word "permit" to mean "authorize," the statute would be so narrow in scope as to be almost silly.

*Id.*

To "permit" thus includes "actively and passively" failing "to prevent [W. Grenda] from continuing his association with both [Grenda Group] and [G. Grenda] after [Defendants] had full knowledge of [W. Grenda's] bar," *Bolla*, 401 F. Supp. 2d at 65, and taking "no significant actions on behalf of [Defendants] to sever ties with [W. Grenda] during the months following the bar order." *Washington Inv. Network*, 475 F.3d at 403.

Although the Second Circuit has not crafted its own definition of "to permit," the plain meaning of the term does not require written or oral authorization but includes providing an opportunity and allowing association to take place.[2] In this case, Defendants went several steps further by continuing W. Grenda's association with them and their investment clients even after they knew W. Grenda had repeatedly violated the SEC bar and impersonated G. Grenda in doing so. Instead of severing ties to W. Grenda, they facilitated and actively maintained them in order to retain W. Grenda's former clients.

The court agrees with the SEC that, even in the light most favorable to Defendants, the undisputed evidence satisfies the plain meaning of "to permit" as set forth in the Adviser's Act and encompasses Defendants' post-bar association with W.

---

[2] *Permit*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("1. To consent to formally; to allow (something) to happen, esp. by an official ruling, decision, or law <permit the inspection to be carried out>. 2. To give opportunity for; to make (something) happen <lax security permitted the escape>. 3. To allow or admit of <if the law so permits>."); *Permit*, Cambridge Dictionary, verb 1. "to allow something" 2. "to make something possible." Cambridge Dictionary, *available at* https://dictionary.cambridge.org/us/dictionary/english/permit.

Grenda which permitted him to violate the SEC bar on numerous occasions. Because the SEC has established that Defendants "permitted" W. Grenda to associate with them in violation of Section 203(f), the SEC's motion for partial summary judgment on Count I is GRANTED.

### C.   Whether the SEC is Entitled to Summary Judgment on its Aiding and Abetting Claim (Count II).

To establish liability for aiding and abetting, the SEC must establish: (1) a primary securities law violation; (2) knowledge of this violation on the part of the aider and abettor or recklessness with regard to the commission of the primary violation; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation. *SEC v. Dibella*, 587 F.3d 553, 566 (2d Cir. 2009); "[T]he SEC may seek an enforcement action against aiders and abettors of 'a violation of any provision' of the Advisers Act . . . which would include certain negligent acts in violation of the Advisers Act." *Id.* at 569.

The SEC has established that Grenda Group violated Section 203(f) of the Advisers Act by permitting W. Grenda to associate with it. It is further undisputed that G. Grenda, as the sole owner and member of Grenda Group and as its Chief Compliance Officer, not only had knowledge of Grenda Group's activities but directed and controlled them. *See SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 802, 813 (2d Cir. 1975) (holding that as "vice-president in charge of trading," aider and abettor "occupied a prominent position within the company[]" such that the "apparent authority exercised by [him]" created liability under agency principles).

Finally, the SEC has established that G. Grenda substantially assisted Grenda Group's primary violation by "join[ing] the specific venture and shar[ing] in it," by undertaking efforts that "contributed to its success," and by "consciously assist[ing] the commission of the specific [violation] in some active way." *DiBella*, 587 F.3d at 566 (quoting *United States v. Ogando*, 547 F.3d 102, 107 (2d Cir. 2008)) (internal quotation marks omitted). G. Grenda made the decision to continue Grenda Group's association with W. Grenda even after he knew that his father had impersonated him in investment

activities and even after he had direct and personal knowledge of W. Grenda's repeated violations of the SEC bar. Had G. Grenda chosen to do so, he could have severed Grenda Group's association with W. Grenda. Instead, he facilitated it by providing access to Grenda Group data systems, cell phones, and clients. Even when the undisputed facts are regarded in the light most favorable to Defendants, the SEC has established that G. Grenda provided substantial assistance to further Grenda Group's violation of Section 203(f).

Because the SEC has established that it is entitled to judgment as a matter of law on its aiding and abetting claim against G. Grenda as set forth in Count II of its Complaint, its motion for partial summary judgment on that count is GRANTED.

## CONCLUSION

For the foregoing reasons, the SEC's motion for partial summary judgment is GRANTED with regard to Count I and Count II of its Complaint. (Doc. 61.)

SO ORDERED.

Dated this ___17th___ day of May, 2021.

Christina Reiss, District Judge
United States District Court