UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

-against-

GRENDA GROUP, LLC, et al.,

Defendants.

18-cv-954-CCR

---

PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR POST TRIAL REMEDIES

David Stoelting
Barry O'Connell
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
Tel: (212) 336-0174 (Stoelting)
stoeltingd@sec.gov
(212) 336-9089 (O'Connell)
oconnellb@sec.gov

February 10, 2022

**TABLE OF CONTENTS**

                                                                                                    **PAGE**

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................... 1

ARGUMENT ................................................................................................................... 2

    I.      Defendants Should be Permanently Enjoined ............................................ 2

    II.     The Court Should Impose Maximum, Third-Tier Civil Penalties. ............... 4

CONCLUSION ............................................................................................................... 11

# TABLE OF AUTHORITIES

**CASES**

*SEC v. Amerindo Inc. Advisors*,
    No. 05 Civ. 5231 (RJS), 2014 WL 2112032 (S.D.N.Y. May 6, 2014 ....................................10

*SEC v. Bolla*,
    401 F.Supp.2d 43 (D.D.C. 2005) ....................................................................................10, 11

*SEC v. Cavanagh*,
    155 F.3d 129 (2d Cir. 1998)....................................................................................................2

*SEC v. Commonwealth Chem. Sec., Inc.*,
    574 F.2d 90 (2d Cir. 1978).......................................................................................................2

*SEC v. Frohling*,
    851 F.3d 132, 139 (2d Cir. 2016)............................................................................................4

*SEC v. Haligiannis*,
    470 F. Supp. 2d 373 (S.D.N.Y. 2007).....................................................................................6

*SEC v. Kane*,
    No. 97 Civ. 2931 (CBM), 2003 WL 1741293 (S.D.N.Y. Apr. 1, 2003) ............................ 9-10

*SEC v. Lorin*,
    76 F.3d 458 (2d Cir. 1996).......................................................................................................4

*SEC v. Razmilovic*,
    822 F. Supp. 2d 234 ..................................................................................................................5

**STATUTES**

15 U.S.C. § 80b-9(e)....................................................................................................................4, 5

15 U.S.C. § 80b-9(e)(2)(A)-(C) .......................................................................................................5

17 C.F.R. § 201.1001 .......................................................................................................................5

Plaintiff Securities and Exchange Commission (the "SEC") respectfully submits this memorandum of law in support of its motion for (i) a permanent injunction and (ii) maximum third-tier civil penalties against Gregory Grenda and Grenda Group LLC ("Grenda Group") (the "Defendants").

## PRELIMINARY STATEMENT

Defendants Gregory Grenda and Grenda Group defrauded over four hundred mostly retired clients for more than five years and exposed those clients to extreme risk. Defendants consciously violated their fundamental duties as investment advisers. Instead of protecting their clients or dealing with them honestly, Defendants chose to permit Walter Grenda to have access to their retirement accounts without telling them he had been barred from the industry because of serious misconduct that involved predatory fraud on vulnerable clients.

Defendants enriched themselves through this misconduct, through hundreds of thousands of dollars in fees they collected while betraying their clients and operating as though they were above the law.

At trial, Gregory Grenda refused to acknowledge his misconduct, contradicted prior admissions, shifted blame to others, and brashly lied to the jury at every opportunity.

Based on the overwhelming evidence, the jury determined, following an eight-day trial, that Defendants violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. § 80b-6(1) and (2) and that Gregory Grenda aided and abetted Grenda Group's violations. The Court, moreover, previously determined that Defendants also violated Section 203(f) of the Advisers Act, 15 U.S.C. § 80b-3(f).

As a result, the Court should enjoin the defendants from future violations of Sections 206(1), 206(2) and 203(f) of the Advisers Act, and impose third tier penalties of $320,000

against Gregory Grenda and $1,550,000 against Grenda Group.

## **ARGUMENT**

### I.      **Defendants Should be Permanently Enjoined.**

Defendants should be permanently enjoined, under Section 209(d) of the Advisers Act,

15 U.S.C. § 80b-b(9), from future violations of Sections 203(f), 206(1) and 206(2) of the

Advisers Act.  Injunctive relief is warranted in an SEC enforcement action if there is a

reasonable likelihood that a defendant would again violate the securities laws.  *SEC v.

Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99-100 (2d Cir. 1978).

Factors that help determine the likelihood of another violation include (i) the fact the

defendant has been found liable for illegal conduct; (ii) the degree of scienter involved; (iii)

whether the conduct is an isolated occurrence; (iv) lack of acknowledgment of wrongdoing; and

(v) whether a defendant might be in a position where future violations could be anticipated.  *See

SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998); *Commonwealth Chem. Sec.*, 574 F.2d at

100.

Regarding the first two factors, the jury found Defendants violated the securities laws

through six counts of illegal conduct, four of which involve a finding of scienter (Defendants'

scienter is also discussed *infra* in connection with civil penalties).  *See* DE 123 (Verdict Sheet).

Regarding the third factor, the Defendants' concealment of Walter Grenda's role at the firm

spanned at least five years and was not in any way isolated.  Regarding the last factor, Gregory

Grenda is strongly positioned to violate the law again if not enjoined.  Gregory Grenda continues

to own and operate Grenda Group, is a registered investment adviser, and he has already

coordinated with his recidivist father Walter Grenda to commit fraud.

But it is the fourth factor, failure to acknowledge wrongdoing, that so strongly calls for a

permanent injunction in this case.  The facts adduced at trial show that Gregory Grenda—instead of taking any responsibility for his actions—lied and blame-shifted repeatedly, evidencing his complete disregard for his role as an investment adviser.

First, Gregory Grenda lied, to his clients and during the trial.  Gregory Grenda claimed he made "probably more than" 379 phone calls after Walter Grenda was charged with fraud in December 2014 (Tr. 844:23) despite being shown a summary of his calls in December 2014 and January 2015 that together revealed fewer than five total phone calls, outgoing or incoming.  (Ex. 102; Tr. at 846).  He testified that he never received Charles Schwab's letter faxed to him terminating Grenda Group's account, claiming complete ignorance as to what fax machines are or how they work.  (Tr. 912:12-16, "I did not.  I don't use the fax machine.  I'm 35 years old. I've used a fax machine maybe five times in my entire life.  I did not get this.  I didn't see it.") (Tr. 912:20-24, "I'm not familiar with faxes, I don't know … I mean, I'm used to e-mail … I don't look at faxes.  I don't send faxes.  I mean, I've never really even used a fax machine.").  He testified that when Walter Grenda impersonated Thomas Pollard on a phone call that the two of them were together and that the call was made with Mr. Pollard's permission, which Mr. Pollard contradicted.  (Tr. 901:22-23; 903:7-8; 904:13-15).  When confronted with the testimony of his own employee, Amanda Almorabi, who told the jury she did not know of Walter Grenda's bar until 2017, Grenda recast her testimony to make it appear as though he had informed her of Walter Grenda's bar in 2015.  (Tr. 935:3-4, "At one point in yesterday's testimony, she did say that I had talked to her in 2015 about it.")  Then, he claimed that Ms. Almorabi—one of two Grenda Group receptionists—was not a person in direct communication with clients.  (Tr. 935:9-10, "No, she's not on the front line of communications"; 935:14-18, "[Almorabi's] duties would have included basically doing paperwork … If a call came in, it would go to Maryann.")

Gregory Grenda also shifted blame to others.  For example, when explaining Ms. Almorabi's testimony that she did not know of Walter Grenda's bar until 2017, Grenda testified that Almorabi was unreliable.  (Tr. 934:21-22, "I wouldn't say 'pretty certain.'  I think she changed her dates multiple times.")  When asked about Thomas Pollard's testimony and his lack of knowledge that Walter Grenda had been barred from the industry and was impersonating him on phone calls, Gregory Grenda testified, "I heard that.  I think he's confused, he couldn't even remember if he was an American citizen or not."  (Tr.  903:19-21).  When shown an email dated June 14, 2018 from a Grenda Group client to Walter Grenda concerning investments, Gregory Grenda testified again that the client must have been confused.  (Ex. 28, Tr. 926:9-10, "… She was elderly.  I think she was confused and that's why it was forwarded to me.").

All told, Gregory Grenda never expressed remorse, took responsibility, nor made assurances against future misconduct.  This fact alone speaks in favor of permanent injunctions. *See*, *e.g.*, *SEC v. Lorin*, 76 F.3d 458, 461 (2d Cir. 1996) (a "court may properly view a culpable defendant's continued protestations of innocence as an indication that injunctive relief is advisable"); *SEC v. Frohling*, 851 F.3d 132, 139 (2d Cir. 2016) (affirming injunction given defendant's "continued manifestation of a lack of concern for his responsibilities under the federal securities laws.").

## II.     The Court Should Impose Maximum, Third-Tier Civil Penalties.

The SEC also seeks civil penalties under Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e).  A civil penalty serves the dual purpose of penalizing past violations and deterring future misconduct, by these Defendants and others.  *SEC v. Razmilovic*, 822 F. Supp. 2d 234, 280 (E.D.N.Y. 2011), *aff'd in relevant part, vacated on other grounds*, 738 F.3d 14 (2d Cir. 2013).

4

The Advisers Act provides that the maximum amount of a civil penalty is the greater of the pecuniary gain by the defendant, or certain amounts per violation set forth by statute. *See* 15 U.S.C. § 80b-9(e).  There are three statutory tiers of penalties:  the first may be imposed for any violation, the second for any violation that involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement", and the third for any violation that involved "fraud or deliberate or reckless disregard of a regulatory requirement" and "resulted in substantial losses or created a significant risk of substantial losses to other persons."  15 U.S.C. § 80b-9(e)(2)(A)-(C).

Under the schedules applicable to Gregory Grenda's conduct (the penalties imposed on natural persons for conduct during the period from Mar. 6, 2013-Nov. 2, 2015), the maximum penalty per violation was $7,500 for first-tier penalties, $80,000 for second-tier penalties, and $160,000 for third-tier penalties.  17 C.F.R. § 201.1001.  Under the schedules applicable to Grenda Group's conduct (penalties imposed on entities for conduct during the same period), the maximum penalty per violation was $80,000 for first-tier penalties, $400,000 for second-tier penalties, and $775,000 for third-tier penalties. *Id.*

Rather than recommending penalties based on number of investors deceived or all of the counts in the verdict sheet plus the summary judgment order, the Commission recommends imposing third-tier penalties on each Defendant, as follows, in connection with the two primary violations—Sections 203(f) and 206 of the Advisers Act (imposing just one penalty for the Section 206 violations rather than two each for both Sections 206(1) *and* 206(2) plus aiding and abetting):

| Violation | Grenda Penalty Amount | Grenda Group Penalty Amount |
|---|---|---|
| Section 203(f) | $160,000 | $775,000 |
| Sections 206(1) and (2) | $160,000 | $775,000 |

| Total | $320,000 | $1,550,000 |
|---|---|---|

In weighing the penalties to impose, courts consider:  (i) the egregiousness of the conduct; (ii) the degree of scienter; (iii) whether the defendant's conduct created substantial losses or the risk of substantial losses; (iv) whether the defendant's conduct was isolated or recurrent; and (v) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.  *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007).  These factors weigh heavily in favor of imposing third-tier penalties.  Defendants' conduct was egregious; carried out intentionally and in complete disregard for regulatory requirements; created grave risk to vulnerable clients; spanned at least five years; and was done for profit—the Defendants made close to $2 million doing it.

Permitting Walter Grenda to remain involved with the Grenda Group after he was barred, unbeknownst to a trusting client pool, was egregious, done intentionally, and created substantial risk to clients.  In 2014, Walter Grenda was charged with a fraud that should have rang intense alarm bells for the Defendants.  Walter Grenda was charged with marketing a hedge fund that lost all its value to a group of clients that he understood "were retired or near retirement, on fixed incomes and lacked investment acumen."  He was charged with lying to those vulnerable investors about the hedge fund's testing of its quantitative model and about the experience of the fund manager.  (Ex. 113).  He was also charged with taking $175,000 from a mother-and-daughter under false pretenses as a loan.  *Id*.  In other words, Walter Grenda was charged with engaging in predatory conduct that exposed investment clients to substantial risk.  Gregory Grenda knew about those charges and his father's predatory capacity.  And despite his fiduciary duty to his clients, Gregory Grenda chose profit over client protection.

Gregory Grenda also knew that Grenda Group clients greatly trusted Walter Grenda.

Walter Grenda testified at trial about how clients would not "financially sneeze" without checking in with him.  (Tr. 1083:8-12).  Gregory Grenda himself wrote to his father, "*you* have built a legacy that will continue to support us."  (Ex. 11) (emphasis added).

Knowing both things—his father's predatory capacity *and* clients' fierce loyalty to his father—the Defendant faced a dilemma and did the wrong thing.  Gregory Grenda chose to permit Walter Grenda to remain involved with the business despite knowing the risk he represented.

As a result, those risks manifested and Grenda Group clients did in fact face risks of substantial loss.  Walter Grenda pretended to be Thomas Pollard, an 85-year-old client, in order to change the address where Mr. Pollard's account statements went to Walter Grenda's own address, creating the risk that no one including Mr. Pollard could track his account activity.  (Tr. 1085:23-1086:2 (Walter Grenda testimony)).  In November 2016, Walter Grenda pretended to be another elderly client in order to inquire about authorizing option trading in the client's retirement account (option trading being generally riskier than standard stock trading and requiring specific permission).  (Ex. 43).  In July 2016 Walter Grenda logged into the retirement account of yet another Grenda Group client and made changes to investments, a client who was serving in the United States military and was stationed in Hawaii at the time.  (Tr. 1088:6-16).  Another time, in May 2016 Walter Grenda pretended to be his son and moved $30,000 of a client's money.  (Exs. 36 and 37).  That client was suffering from depression (Tr. 1089:24-25); had multiple surgeries (Tr. 1090:18); had multiple lawsuits (Tr. 1090:18-19); and even had trouble communicating (Tr. 1090:17).  The Defendant Gregory Grenda knew about this client's issues at the time because Walter Grenda told him about them.  (Tr. 1093:3-6).

Grenda Group clients were exposed to these substantial risks because of Defendants'

conscious choice to operate the Grenda Group *with* Walter Grenda in complete disregard for regulatory requirements such as Sections 203(f) and 206(1) and (2) of the Advisers Act.

The Defendants' operation of the Grenda Group *with* Walter Grenda was no mistake, it was the plan.  Gregory Grenda referred to his father as his "equal partner" in a June 2015 email to him, wrote about how they needed to "work together," and also discussed how the two "cannot afford to be sloppy."  (Ex. 11).  Several witnesses, including Linda Fusco and Don Peters, testified clearly about sitting with both Defendant Gregory Grenda and his father Walter Grenda after July 2015 when Walter Grenda was barred and receiving investment advice from both Grendas.  Emails introduced at trial showed repeated instances of Defendants communicating *about Walter Grenda's involvement with the firm*.  In one clear example, in April 2017, the Defendant received an email from a client indicating they wanted to invest $50,000 after receiving a report from Defendants.  The Defendant wrote, "This is Gregory Grenda, I will relay your message [to Walter Grenda]."  (Ex. 26).  All of that conduct is in complete disregard for regulatory requirements, including Section 203(f) of the Advisers Act and the Defendants' fiduciary obligation to clients, both of which compelled the Defendants to remove Walter Grenda from the business.

Deliberately operating the Grenda Group as a "group" alongside his father (Ex. 11, his "equal partner," finding a way to "work together") shows scienter.  Both Grendas meeting with Linda Fusco and Don Peters post-bar, giving investment advice jointly, shows scienter.  Extensive email traffic evidencing Walter Grenda's continued involvement with the firm post-bar shows scienter.  (*See* Exs. 25 (post-bar email investor spoke with "father" about a 529 plan and Defendant gives follow-up advice); 13 (post-bar email to both Grendas seeking advice); 16 (post-bar email from Defendant to father about investments); 17 (post-bar investor inquiry to

both Grendas); 19 (post-bar email to Walter Grenda "Walt, if Greg is out of town perhaps you can let me know if I have the right bases covered."); 15 (post-bar email from investor, "My understanding is that we three"—meaning Walter, Defendant, and client—"would have a discussion about SWAN"—an investment strategy). But the Defendants' conduct was even worse—they did not just consciously disregard their obligations as investment advisers to operate distinctly from Walter Grenda—they also lied to investors to cover-up Walter Grenda's impermissible and problematic involvement with the firm.

When Charles Schwab terminated the Defendants from their platform because of Walter Grenda, the Defendants lied to their clients. They sent clients disingenuous letters claiming that the Grenda Group was moving to Interactive Brokers because of innovative technology—a letter that left out all the facts that investors had a right to know. (Ex. 77). Michelle Smith testified at trial about how the Defendants were dishonest with Charles Schwab to cover-up the "Group's" business plan of improperly including Walter Grenda. As the jury rightly inferred—all of these actions demonstrate (i) egregiousness; (ii) scienter; (iii) risk of substantial loss to vulnerable investors; and (iv) long-running commitment to the fraud spanning years.

The last factor in the *Haligiannis* analysis warrants no different outcome. If the Defendants were to claim an inability to pay a penalty, two significant factors weigh against consideration of any moment-in-time claim of an impoverished condition. First, Grenda is young and has many years to earn money to satisfy the judgment. *See SEC v. Kane*, No. 97 Civ. 2931 (CBM), 2003 WL 1741293, at *4 (S.D.N.Y. Apr. 1, 2003) ("[T]he court agrees with the Commission that it should not ignore the possibility that a defendant's fortunes will improve …"). Second, Defendants—after not paying for the purchase of the Grenda Group (a business managing upwards of $30 million in client assets)—collected over $1.7 million in fees while

9

lying to clients and operating as though he and his father were above the law.  (Ex. 106 (fees));
*SEC v. Amerindo Inc. Advisors*, No. 05 Civ. 5231 (RJS), 2014 WL 2112032 at *12 (S.D.N.Y.
May 6, 2014) (finding that defendants' financial condition, "whatever it is, does not support a
reduced fine," where they "knowingly lied to numerous investors over … many years").

Finally, although there is precedent supporting lower penalty figures for investment
advisers who violated similar statutes, this case is distinguishable from those precedents.  First,
the Defendants in this action are not situated similarly to Walter Grenda.  Although Walter
Grenda paid only $25,000 in connection with his settlement of this action shortly after the case
was filed, his settlement is different in two important ways.  First, the Defendants in this case
were the investment advisers.  The buck stopped with Gregory Grenda and the fiduciary duty to
clients rested squarely on his shoulders.  (*see* DE 22).  So while Walter Grenda certainly
disregarded his own bar from the industry, and misled clients, it was the Defendants who made
all of that possible while sitting in positions of extreme trust.  Gregory Grenda also misled other
gatekeepers, including brokers like Charles Schwab, that he was keeping Walter Grenda away
from the business—when he was not.  Second, Gregory Grenda never once took responsibility
for his actions during the pendency of this action including the eight days of trial when he
provided dubious testimony and pointed the finger at others.

This case is also distinguishable from the penalties that were imposed against certain
defendants in *SEC v. Bolla*, 401 F.Supp.2d 43 (D.D.C. 2005).  In that action, involving violations
of Sections 203(f), 206(1), and 206(2) of the Advisers Act, the court issued only a $15,000
penalty against defendant Radano and only $50,000 against his investment advisory firm, despite
the Commission's trial briefs seeking more.  *See id* at 46.  But *Bolla* has important differences
from this case.  First, in *Bolla*, the court characterized the defendant Radano (who received only

10

a $15,000 penalty) as the "junior partner" in the arrangement.  *Id.* at 63.  Here, Gregory Grenda is the sole owner, chief executive, and even Compliance Officer of the Grenda Group—so by no means a "junior partner" to Walter Grenda.  Second, there is no similar record in *Bolla* of Radano knowing that a barred person was acting dangerously toward clients.  Although Radano violated Section 203(f) by permitting a barred person—Steven Bolla—to remain part of his firm, and lied to certain clients about that, Bolla himself was not acting in similar ways to Walter Grenda.  For example, Steven Bolla was not imitating clients on phone calls to brokers, he was not making unauthorized changes in client accounts, or moving significant amounts of money without authorization.  Here, Walter Grenda is a quantum leap more dangerous to clients than the record showed Steven Bolla to be in that case.  Nor is there the same record in *Bolla* as here of Walter Grenda being predatory specifically with respect to a large client pool of mostly retired, elderly clients who lacked investment acumen.

Accordingly, the Commission seeks third-tier penalties against Gregory Grenda and the Grenda Group in this case.  Defendants presented grave risk to clients and acted on a brazen plan that disregarded their clients and their duties as investment advisors.  Further, a meaningful penalty will strongly deter other investment advisers who are considering whether to unlawfully permit barred persons to associate with their firms.

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court grant the relief set forth above.

Dated: New York, New York
February 10, 2022

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

/s *Barry O'Connell*

_____
David Stoelting
Barry O'Connell
New York Regional Office
200 Vesey Street, Suite 400
New York, NY  10281
(212) 336-0174 (Stoelting)
stoeltingd@sec.gov
(212) 336-9089 (O'Connell)
oconnellb@sec.gov

cc (by ECF):
Joseph G. Makowski, Esq.
Law Office of Joseph G. Makowsi
448 Delaware Avenue
Buffalo, NY 14202
Counsel to Defendants