UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

        Plaintiff

v.                                                Civil Action No.:
                                                1:18-cv-00954

GRENDA GROUP, LLC and
GREGORY M. GRENDA

        Defendants.
_____


# DEFENDANTS', GRENDA GROUP, LLC AND GREGORY M. GRENDA, MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR POST-TRIAL SANCTIONS


                                                      JOSEPH G. MAKOWSKI, LLC

                                      By:    Joseph G. Makowski, Esq.
                                                  *Attorneys for Defendants*
                                                  *Grenda Group, LLC and*
                                                  *Gregory M. Grenda*
                                                  448 Delaware Avenue
                                                   Buffalo, New York 14202
                                                   (716) 880-1891
                                                   jmakowski@aol.com

## TABLE OF CONTENTS

Page

Table of Authorities ………………………………………………………………………ii

Introduction ………………………………………………………………………………..1

Preliminary Statement ……………………………………………………………………..1

Factual and Procedural History …………………………………………………………....2

      A. The Timeline …………………………………………………………………5
      B. Defendants' Interpretation of Walter Grenda's July 31, 2015 Ban ……………5
      C. Upon Learning of Walter Grenda's Violations of His Bar, Greg
         Grenda Took Swift and Definitive Action Against Walter Grenda …………..6

Argument …………………………………………………………………………………..7

      A. Defendants Should Not Be Subject to a Permanent Injunction ……………….7

         1. Violation By Defendants Was Not Egregious ……………………….7
         2. The Degree of Scienter Involved was Minimal, at Best ……………..8
         3. The Nature of the Violation was Isolated ……………………………9.
         4. Defendants' Sincerity Against Future Violations ……………….......9

      B. If This Court is to Impose Financial Penalties, It Should Impose First-
         Tier Penalties ……………………………………………………………......11

         1. Violation by Defendants Was Not Egregious ……………………….12
         2. The Degree of Scienter Involved was Minimal, at Best ……………..12
         3. The Nature of the Violation was Isolated ………………………….....13
         4. Whether the Conduct Created Substantial Losses or The Risk
           of Substantial Losses ……………………………………………… 14
         5. Defendants' Current and Future Financial Condition ………………15
         6. The Penalties Awarded Against Walter Grenda Show How Extreme the
           Penalties the SEC are Asking For ……………………………………15
         7. Defendants are Entitled to a Hearing ………………………………16

Conclusion ……………………………………………………………………………......16

## TABLE OF AUTHORITIES

**Cases**

*SEC v Cavanagh.*, 155 F3d 126, 135 [2d Cir. 1998] ………………………………….…..7

*SEC v Coates.*, 137 F.Supp.2d 314[S.D.N.Y 2001]…………………………………….12.

*SEC v Commonwealth Chem. Sec., Inc.*, 574 F2d 90, 99 [2d Cir. 1978] ……………..…7,10

*SEC v Haligiannis* (470 F.Supp.2d 373 [S.D.N.Y. 2007] …………………………….…..10,12
*SEC v Universal Major Indus. Corp.*, 546 F2d 1044, 1048 [2d Cir. 1976],
*cert denied* 434 US 834 [1977] ……..………………………………………....………..7,9

**Statutes**

Securities Act of 1933 …………………………………………………………………....3

Securities Exchange Act of 1934 ……………………………………………………….....3

Investment Advisors Act of 1940 …………………………………………………………1

Investment Company Act of 1940 ………………………………………………………...3

## INTRODUCTION

Defendants, Grenda Group, LLC and Gregory M. Grenda (collectively "Defendants" or individually "Grenda Group" and "Greg Grenda") submit this Memorandum of Law in opposition to plaintiff, the United States Securities and Exchange Commission's ("Plaintiff") post-trial brief for (i) a permanent injunction and (ii) maximum third-tier civil penalties against them.

## PRELIMINARY STATEMENT

On December 10, 2021, following a jury trial, Defendants were found liable for violations of §§ 203(f) and 206(1) and (2) of the Investment Advisors Act of 1940 (the "Advisors Act"), Grenda Group for the violation and Greg Grenda for aiding and abetting Grenda Group's violations. Contrary to the assertions set forth in the SEC's Memorandum of Law submitted in support of its motion for sanctions, a review of the record in this case, including the trial testimony, conclusively demonstrates that any association Water Grenda had with Defendants following his ban effective July 31, 2015, was initiated entirely by Walter Grenda and, at all relevant times, was without the knowledge of Defendants.

Defendants did not engage in any actions with the intent to defraud their clients, and while Defendants earned commissions for managing their client's accounts, Defendants did not "betray" their clients, act as thought they were "above the law", and did not engage in "predatory fraud on vulnerable clients". *None of Grenda Group's clients lost money as the result of the conduct for which Defendants were found liable.*

Defendants submit that the permanent injunction sought by the SEC, and the third tier penalties of $320,000.00 against Greg Grenda and $1,550,000.00 against Grenda Group, are excessive and unduly punitive in light of the fact that none of the Grenda Group clients lost any

1

money. Instead, following a hearing, Defendants should not be subject to a permanent injunction and, should the Court impose fines, it should be first-tier fines.

## FACTUAL AND PROCEDURAL HISTORY

Prior to July 31, 2015, Walter Grenda, Greg Grenda's father, had for many years been involved in the financial services industry. In or about 1998, Walter Grenda founded Reliance Financial Group, Inc. ("Reliance Group"), a Buffalo-based investment adviser. In or about 2011, Walter Grenda and Timothy Dembski co-founded, and jointly owned, Reliance Financial Advisors, LLC ("Reliance Financial"). Reliance Financial, now defunct, was a registered investment adviser. In approximately February 2011, Walter Grenda and Timothy Dembski began transferring their advisory clients from Reliance Group to Reliance Financial. Both Reliance Group and Reliance Financial operated out of 2819 William Street, Cheektowaga, New York, a building owned by Walter Grenda, and his wife Maryann Grenda, since 1994.

In early 2011, Timothy Dembski co-founded Prestige Wealth Management, LLC ("Prestige") and its general partner, Prestige Wealth Management Fund, LP (the "Prestige Fund"), with his friend, Scott Stephen. Stephen had no professional experience in the securities industry when he was hired by Reliance Group to work in marketing. Dembski and Stephen, without Walter Grenda, set up the Prestige Fund to trade based on a trading algorithm developed by Stephen. Walter Grenda, who never became an owner of the Prestige Fund, reviewed the Prestige Fund's documents, including the private placement memorandum and the trading algorithm, and recommended investment in the Prestige Fund to certain of his advisory clients at Reliance Financial.

From February 2011 until March 2012, Walter Grenda invested approximately $8 million in the Prestige Fund on behalf of his advisory clients, telling them that the Prestige Fund's trading

would be fully automated and directed by the trading algorithm. However, in September 2011, Stephen stopped using automated trading altogether because the algorithm never worked as intended, and he began manually placing trades. In or about October 2012, Walter Grenda withdrew his clients' investments from the Prestige Fund due to its mediocre investment performance between 2011 and 2012. By October 2012, Walter Grenda's clients had collectively lost approximately $320,000, or 4% of their investment funds. In December 2012, the Prestige Fund collapsed, losing approximately 80% of its value.

On December 10, 2014, the SEC issued an order instituting administrative and cease-and-desist proceedings against Walter Grenda, Timothy Dembski and Scott Stephen, alleging violations of the Securities Act of 1933, the Securities Exchange of 1934, the Advisers Act and the Investment Company Act of 1940 arising out of the collapse of the Prestige Fund and two (2) unrelated loans Walter Grenda previously took from his advisory clients.

In July 2015, Walter Grenda negotiated a settlement with the SEC without admitting or denying liability, accepted a three (3) year bar, and agreed to pay disgorgement of $25,000.00, prejudgment interest of $2,410.90 and civil penalties of $50,000.00. Pursuant to the Offer of Settlement, on July 31, 2015, Walter Grenda was "barred from association with any broker, dealer, investment adviser . . . with "the right to apply for reentry after three (3) years to the appropriate self-regulatory organization, or if there is none, to the Commission".

Greg Grenda is Walter Grenda's son who made his career in the financial services industry. Walter Grenda had planned for Greg Grenda to succeed him at Reliance Financial when he retired. However, given the SEC problems Walter Grenda faced in 2014 and 2015 with the collapse of the Prestige Fund, Walter Grenda and the Grenda family decided that Walter Grenda's succession plan for selling the business and its assets to Greg Grenda should be put in place. Accordingly, in early

2014 Greg Grenda formed Grenda Group, a single member New York limited liability company, and Grenda Group entered into an Asset Purchase Agreement and Promissory Note, drafted by counsel, transferring the assets of Reliance Financial, including clients, all telephone numbers to the business, furniture, office equipment, technologies and tangible property located at 2819 William Street to Grenda Group.

A Promissory Note, dated February 1, 2014, was executed by Walter Grenda and Greg Grenda, on behalf of Grenda Group. The Promissory Note provided that Grenda Group was to pay Walter Grenda $2 million, together with interest at a rate of 10% per annum, for the purchase of certain assets pursuant to the Asset Purchase Agreement, including the building at 2819 William Street. Although the Promissory Note provided that Grenda Group purchased the real property located at 2819 William Street, this transaction never took place. Neither Grenda Group, nor Greg Grenda, acquired title to 2819 William Street because it was later discovered by Greg Grenda to have been encumbered by Walter Grenda as security for a loan. A Bill of Sale and Assignment, also dated February 1, 2014, concluded the documents relative to the sale of Reliance Financial's assets to Grenda Group.

When Greg Grenda initially formed Grenda Group and purchased the Reliance Financial book of business in early February 2014, Walter Grenda assisted in the transfer of the former Reliance Financial clients to Grenda Group, as Walter Grenda had longstanding personal and professional relationships with the clients.

Following the completion of the transition activity in mid-2014, Walter Grenda eventually phased out of investment activity and, in January 2016, formed Generational Wealth Management, LLC ("GWM"), to engage in tax and estate planning services, Walter Grenda never became associated with the Grenda Group as an owner, consultant, employee, independent contractor, or

investment adviser. In August 2016, Greg Grenda was contacted by Schwab, the client custodian for Grenda Group, concerning a series of recorded telephone calls to it which were later discovered to have been made by Walter Grenda impersonating him. On September 1, 2018 following its investigation the SEC filed suit against Walter Grenda, Grenda Group and Gregory Grenda. On November 6, 2018, Walter Grenda entered into a Consent Decree with the SEC, without admission or denial of the allegations in the complaint in the present action. Pursuant to the November 6, 2018 Consent Decree, Walter Grenda was permanently banned and restrained and enjoined from violating the SEC's July 31, 2015 Order, and ordered to pay a civil penalty in the amount of $25,000.00. On December 3, 2018, this Court issued a Final Order concerning Walter Grenda and Walter Grenda was released as a defendant in this action.

### A. The Timeline

Any conduct engaged in by Walter Grenda prior to the institution of his bar on July 31, 2015 is irrelevant for the purposes of imposing any financial penalty on Defendants insofar as prior to the institution of the bar, there were no prohibitions on Walter Grenda associating with an investment advisor, acting as an investment advisor, or providing investment advice to former clients of Reliance Financial, or to Grenda Group clients. Any evidence presented at trial of any such conduct prior to Jaul 31, 2015 should be excluded as irrelevant in determining any financial penalty.

### B. Defendants' Interpretation of Walter Grenda's July 31, 2015 Ban

Following Walter Grenda's bar, Greg Grenda reviewed the SEC Order, and with Walter Grenda's input, interpreted it to prohibit Walter Grenda from associating with Grenda Group to mean that Walter Grenda was no longer able to work in the investment industry during the bar. In January 2016, when Walter Grenda formed GWM, Gregory Grenda presumed that Walter Grenda

could form a limited liability company which performed tax and estate planning services. Following Walter Grenda's bar, Greg Grenda was faced with the financial realities of running Grenda Group; serving its clients, most of whom lived in Cheektowaga, New York; paying for the Reliance Financial assets; employing two (2) people, one of whom was his mother, Maryann Grenda; and Grenda Group being a lessee in a building owned by his father.

### C. Upon Learning of Walter Grenda's Violations of His Bar, Greg Grenda Took Swift and Definitive Action Against Walter Grenda

After receiving a telephone call from Schwab in August 2016, during which he was played recordings of Walter Grenda calling Schwab, impersonating Greg Grenda without Greg's knowledge, Greg Grenda took swift and definitive action to ensure that Walter Grenda never engaged in such conduct again with respect to Grenda Group or its clients.

Shortly after concluding the telephone call with Schwab in August 2016, which provided Greg Grenda with knowledge that Walter Grenda was violating his July 31, 2015 bar, Greg Grenda drove to Walter Grenda's house to confront him about the calls. When Greg Grenda arrived at Walter Grenda's house, he told Walter Grenda that he received a call from Schwab, during which they played recorded messages received from Walter Grenda's cell phone number. After Greg Grenda asked Walter Grenda for an explanation, Walter Grenda refused to provide him with either an explanation or an acknowledgment. Instead, Walter Grenda set silently, and Greg Grenda returned to the Grenda Group office.

Upon arriving back at the Grenda Group office, Greg Grenda changed all of the Grenda Group passwords and took physical possession of the three (3) key fobs that were used to log into the Charles Schwab system for SEC trading, and kept them on his person at all times. Greg had the locks to the Grenda Group office changed. This consisted of changing the physical locks and having the alarm company assign a new electronic key code. Greg Grenda contacted AT&T,

Grenda Group's telephone service provider, and removed Walter Grenda from the cell phone ending in 6234. Walter Grenda was assigned a new cellular number ending in 1186 from the AT&T family plan coverage. In short, as soon as he learned that Walter Grenda had violated his bar, Greg Grenda took every step possible to ensure that a breach of Grenda Group by Walter Grenda did not happen again.

## ARGUMENT

### A. Defendants Should Not Be Subject to a Permanent Injunction

A permanent injunction is appropriate where there has been a violation of the federal securities laws and there is a reasonable likelihood of future violations (*see SEC v Commonwealth Chem. Sec., Inc.*, 574 F2d 90, 99 [2d Cir. 1978]). In determining whether there is a reasonable likelihood of future violations, a district court may consider: (i) the egregiousness of the violation; (ii) the degree of scienter: (iii) the isolated or repeated nature of the violations; and (iv) the sincerity of the defendant's assurances against future violations (*see SEC v Cavanagh*, 155 F3d 126, 135 [2d Cir. 1998]); *Commonwealth Chem Sec., Inc.*, 574 F2d at 100; *SEC v Universal Major Indus. Corp.*, 546 F2d 1044, 1048 [2d Cir. 1976]). A review of the factors demonstrates they weigh heavily against issuing a permanent injunction against Defendants.

#### 1. Violation By Defendants Was Not Egregious

Here, the conduct giving rise to the violations for which Defendants were found liable was egregious on the part of Walter Grenda, but not on the part of Defendants. Following Walter Grenda's bar, Greg Grenda reviewed the SEC Order and interpreted it as meaning that Walter Grenda was no longer able to work in the financial industry during the bar. Greg Grenda did not interpret the July 31, 2015 bar as prohibiting Walter Grenda from forming GWM to perform tax

and estate planning services and working in the same building as Grenda Group, which was owned by Walter Grenda.

In failing to notify all Grenda Group clients of Walter Grenda's July 31, 2015 ban, Defendants committed an error of omission, not commission, and they did not mislead any Grenda Group clients into believing that Walter Grenda had not received a ban. Moreover, the testimony at trial revealed that Walter Grenda's ban was in the public domain, through publication in The Buffalo News, and there was testimony from Grenda Group clients Jack Wesley and Peter Andrews that they were aware of Walter Grenda's ban, but choose to stay with Defendants regardless. This factor weighs against imposing a permanent injunction upon Defendants.

2. The Degree of Scienter Involved was Minimal, at Best

As previously set forth above, the circumstances of the conduct from which Defendants' liability arose clearly reveals that Walter Grenda's abhorrent behavior, most of which Greg Grenda did not know about, was the cause of the liability finding. A review of the record demonstrates that Walter Grenda, who as of July 31, 2015 was banned for three (3) years, admitted to engaging in a majority of the complained of conduct, <u>without</u> Greg Grenda's knowledge. Walter Grenda used his key to enter the building after Greg Grenda had left for the day and placed calls to Schwab, pretending to be Greg Grenda to equalize trades and also impersonated Thomas Pollard on a call. Greg Grenda did not have knowledge of the calls that Walter Grenda had made to Schwab until Greg Grenda was contacted by Schwab in August 2016 and played the tapes.

After learning what his father had done, Greg Grenda changed all of the Grenda Group passwords and took physical possession of the three (3) key fobs that were used to log into the Charles Schwab system for SEC trading, and kept them on his person at all times. Greg had the locks to the Grenda Group office changed. This consisted of changing the physical locks and

having the alarm company assign a new electronic key code. Greg Grenda contacted AT&T, Grenda Group's telephone service provider, and removed Walter Grenda from the cell phone ending in 6234. Walter Grenda was assigned a new cellular number ending in 1186 from the existing AT&T family coverage plan. In short, as soon as he learned that Walter Grenda had violated his bar, Greg Grenda took every step possible to ensure that a breach of Grenda Group by Walter Grenda did not happen again. This factor weight against imposing a permanent injunction upon Defendants.

### 3. The Nature of the Violation was Isolated

The SEC attempts to make it appear as though Defendants concealed Walter Grenda's role at Grenda Group for at least five (5) years. However, the evidence presented at trial demonstrates this is not at all what happened. Greg Grenda misconstrued the nature of Walter Grenda's 2015 ban, failing by omission to alert all clients to the ban. Walter Grenda then opened and ran GWM from the same building in which Grenda Group was located. Walter Grenda was <u>not</u> working side-by-side with Greg Grenda, making investment decisions, at Grenda Group. Rather, Walter Grenda was operating GWM out of the same building as Grenda Group, providing tax and estate planning services. This factor weighs against imposing a permanent injunction upon Defendants.

### 4. Defendants' Sincerity Against Future Violations

Here, Defendants' allegedly improper conduct began to occur on July 31, 2015, when Walter Grenda's bar went into effect, and the time of the trial, a period of almost six and one-half (6½) years had passed. In that entire time period, despite the SEC's protestations of Greg Grenda's lying to his clients, associating with Walter Grenda and intentionally permitting him to remain involved with Grenda Group after his bar, creating grave risk to clients, the SEC did not move for a preliminary injunction after it filed suit in September 2018.

The district court may properly consider the amount of time between the violations and the trial in deciding whether to issue an injunction (*see generally SEC v Universal Major Industries Corp.*, 546 F2d 1044, 1048 [2d Cir. 1976], *cert denied* 434 US 834 [1977]). Here, in the nearly six and one-half (6½) years between the alleged wrongdoing and trial, during which Grenda Group continued to operate, the SEC did not move for a preliminary injunction. Yet, now the SEC contends that Defendants should be permanently enjoined. This factor weighs against imposing a permanent injunction upon Defendants.

The cases cited by the SEC in support of its request for a permanent injunction are distinguishable from the present case. In *Commonwealth Chem. Sec., Inc.* (574 F2d at 90), injunctions and disgorgement of fees were upheld for the defendants, with the court noting that "the ultimate test is whether the defendant's past conduct indicates . . . that there is a reasonable likelihood of further violation in the future" (*id.*, internal citation and quotation omitted). The court upheld the injunction because the defendants violations were "repeated and persistent" and that even after a finding of liability, one defendant was still receiving funds from the fraud (*see id.*). Here, once Greg Grenda became aware of what Walter Grenda was doing, Greg Grenda immediately took appropriate steps to prevent it from happening again. These steps included, but are not limited to, securing new office space that Walter Grenda did not have access to, and severing all contact with Walter Grenda.

In *SEC v Haligiannis* (470 F.Supp.2d 373 [S.D.N.Y. 2007]), the SEC was granted a permanent injunction where the defendant went to jail for contempt, pled guilty criminally for engaging in a ponzi scheme, which included producing and offering to investors several years of false statements and newsletters, then fled the jurisdiction becoming a fugitive. The court noted that, rather than expressing remorse, the defendant fled and became a fugitive. Such is most

definitely not the case with Defendants, who have fully cooperated in every stage of the SEC's investigation.

Given the foregoing, it is submitted that the SEC has not established that a permanent injunction is warranted against Defendants because of the lengthy lapse of time and the absence of a showing that Defendants will repeat the past behavior.

**B.** **If This Court is to Impose Financial Penalties, It Should Impose First-Tier Penalties**

The SEC contends that this Court should impose third-tier civil penalties against Defendants pursuant to Section 209(e) of the Advisers Act in the amount of:

| Violation | Grenda Penalty Amount | Grenda Group Penalty Amt. |
|---|---|---|
| Section 203(f) | $160,000 | $775,000 |
| Sections 206(1) and (2) | $160,000 | $775,000 |
| Total | $320,000 | $1,550,000 |

Defendants contend that this Court should impose first-tier civil penalties against Defendants pursuant to Section 209(e) of the Advisers Act in the amount of:

| Violation | Grenda Penalty Amount | Grenda Group Penalty Amt. |
|---|---|---|
| Section 203(f) | $5,000 | $50,000 |
| Sections 206(1) and (2) | $5,000 | $50,000 |
| Total | $10,000 | $100,000 |

In determining whether civil penalties should be imposed, and the amount of the fine, courts look to a number of factors, including: (i) the egregiousness of the defendant's conduct; (ii) the degree of the defendant's scienter; (iii) whether the defendant's conduct created substantial

11

losses or the risk of substantial losses to other persons; (iv) whether the defendant's conduct was insulated or recurrent; and (v) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition (*see SEC v Coates*, 137 F.Supp.2d 314, 429 [S.D.N.Y. 2001]), *Haligiannis*, 470 F.Supp.2d at 386).

### 1. Violation By Defendants Was Not Egregious

The conduct giving rise to the violations for which Defendants were found liable was egregious on the part of Walter Grenda, but not on the part of Defendants. Following Walter Grenda's bar, Greg Grenda reviewed the SEC Order and interpreted as meaning that Walter Grenda was no longer able to work in the investment industry during the bar. Greg Grenda did not interpret the July 31, 2015 bar as prohibiting Walter Grenda from forming GWM to perform tax and estate planning services and working in the same building as Grenda Group, which was owned by Walter Grenda.

In failing to notify all Grenda Group clients of Walter Grenda's July 31, 2015 ban, Defendants committed an error of omission, not commission, and they did not mislead any Grenda Group clients into believing that Walter Grenda had not received a ban. Moreover, the testimony at trial revealed that Walter Grenda's ban was in the public domain, through publication in The Buffalo News, and there was testimony from Grenda Group clients Jack Wesley and Peter Andrews that they were aware of Walter Grenda's ban, but choose to stay with Defendants regardless. This factor weighs against imposing third-tier penalties upon Defendants.

### 2. The Degree of Scienter Involved was Minimal, at Best

The circumstances of the conduct from which Defendants' liability arose clearly reveals that Walter Grenda's abhorrent behavior, most of which Greg Grenda did not know about, was the cause of the liability finding. A review of the record demonstrates that Walter Grenda, who as of

July 31, 2015 was banned for three (3) years, admitted to engaging in a majority of the complained of conduct, <u>without</u> Greg Grenda's knowledge. Walter Grenda used his key to enter the building after Greg Grenda had left for the day and placed calls to Schwab, pretending to be Greg Grenda to equalize trades and also impersonated Thomas Pollard on a call. Greg Grenda did not have knowledge of the calls that Walter Grenda had made to Schwab until Greg Grenda was contacted by Schwab in August 2016 and played the tapes.

After learning what his father had done, Greg Grenda changed all of the Grenda Group passwords and took physical possession of the three (3) key fobs that were used to log into the Charles Schwab system for SEC trading, and kept them on his person at all times. Greg had the locks to the Grenda Group office changed. This consisted of changing the physical locks and having the alarm company assign a new electronic key code. Greg Grenda contacted AT&T, Grenda Group's telephone service provider, and removed Walter Grenda from the cell phone ending in 6234. Walter Grenda was assigned a new cellular number ending in 1186 from the AT&T family coverage plan. In short, as soon as he learned that Walter Grenda had violated his bar, Greg Grenda took every step possible to ensure that a breach of Grenda Group by Walter Grenda did not happen again. This factor weight against imposing third-tier penalties upon Defendants.

        3.    <u>The Nature of the Violation was Isolated</u>

The SEC attempts to make it appear as though Defendants concealed Walter Grenda's role at Grenda Group for at least five (5) years. However, the evidence presented at trial demonstrates this is not at all what happened. Greg Grenda misconstrued the nature of Walter Grenda's 2015 ban, failing by omission to alert all clients to the ban. Walter Grenda then opened and ran GWM from the same building in which Grenda Group was located. Walter Grenda was <u>not</u> working side-

by-side with Greg Grenda, making investment decisions, at Grenda Group. Rather, Walter Grenda was operating GWM out of the same building as Grenda Group, providing tax and estate planning services. This factor weighs against imposing third-tier penalties upon Defendants.

        4.    Whether the Conduct Created Substantial Losses or The Risk of Substantial Losses

There was no evidence whatsoever presented at trial that Defendants' conducted created substantial losses, or the risk of substantial losses, to any Grenda Group client or to the market. Prior to trial, the SEC sought to preclude, and was granted preclusion of evidence, of any Grenda Group investor gains or losses. Therefore, there was no evidence presented of any Grenda Group investors who lost money including investors who testified for the plaintiff. However, there was evidence presented at trial of investors Jack Wesley and Patrick Andrews who were aware that Walter Grenda had been banned as of July 31, 2015 and decided to remain clients of Grenda Group. The SEC presented no evidence that any clients would have left Grenda Group had there been disclosure of Walter Grenda's bar, while on the other hand, Defendants presented evidence that, in the form of testimony from clients, who were aware of Walter Grenda's ban and continued to do business with Grenda Group.

In its post-trial brief, the SEC spends a lot of time reiterating what Walter Grenda was charged with leading up to his July 31, 2015 ban. This is irrelevant when it comes to determining what, if any, fine should be levied against Defendants. Next, the SEC attempts to create risk to Grenda Group clients (and scienter to Greg Grenda) by stating that Greg Grenda was operating Grenda Group as a "group" alongside Walter Grenda. This contention is not supported by the evidence at the trial. In an attempt to prove this, the SEC points to emails between Walter Grenda and Greg Grenda dated in June 2015, prior to Walter Grenda's ban.

However, the evidence at trial reveals no losses, or risk of loss, to investors. In the absence of any evidence of any losses, let alone any substantial losses or the risk of substantial losses, tier-one penalties in the amount of $5,000, for a total of $10,000, are appropriate against Greg Grenda and in the amount of $50,000, for a total of $100,000, are appropriate against Grenda Group.

5. Defendants' Current and Future Financial Condition

The SEC contends that Defendants are in a position to pay a substantial fine because they made nearly $1.7 million in profit between 2015 and 2020. They are commissions that Grenda Group earned. In addition, this $1.7 million was payable to Grenda Group over a number of years, from 2014 until 2020, prior to making payments for the purchase price of Grenda Group; paying employees; rent; telephones; computers; federal and New York State corporate and personal income taxes and other business expenses. Should the court order a hearing, defendants are prepared to provide relevant federal and New York State income tax returns which show the Grenda Group net income and Greg Grenda's income.

6. The Penalties Issued Against Walter Grenda Show How Extreme the Penalties the SEC are Asking for Against Defendants

In July 2015, at the conclusion of an investigation that revealed Walter Grenda placed his clients into a hedge fund that lost 80% of its value and was run by someone who had no qualifications to do so, Walter Grenda negotiated a settlement with the SEC, without admitting or denying liability, in which he agreed to pay disgorgement of $25,000.00, prejudgment interest of $2,410.90 and civil penalties of $50,000.00, and on July 31, 2015 received a three (3) year bar with the opportunity to reapply. On September 1, 2018 Walter Grenda was named as a defendant in the present lawsuit as the result of his egregious conduct giving rise to the litigation. In December 2018 Walter Grenda was able to settle out of this lawsuit in exchange for a Consent

Decree permanently barring and restraining and enjoining him from violating the SEC's July 31, 2015 Order, and paying a civil penalty in the amount of $25,000.00.

For the SEC to demand Greg Grenda pay a third-tier civil penalty the amount of $320,000, and Grenda Group to pay a third-tier civil penalty in the amount of $1,550,000 when Walter Grenda, whose conduct in violating the July 31, 2015 Consent Decree gave rise to this litigation, was able to settle for a permanent injunction and a civil fine of $25,000, is entirely disproportionate.

### 7. Defendants are Entitled to a Hearing

Defendants maintain that this Court should deny the SEC request for a permanent injunction and impose first-tier civil penalties against Defendants pursuant to Section 209(e) of the Advisers Act in the amount of $10,000 against Greg Grenda and $100,000 against Grenda Group. If this Court declines to do so, Defendants request a hearing on whether the SEC is entitled to a permanent injunction and the amount of civil penalties to be imposed against them, as the SEC has not made the evidentiary required to grant a permanent injunction and impose tier-three penalties.

### CONCLUSION

It is respectfully submitted that this Court should enter an Order denying the SEC a permanent injunction and impose first tier civil penalties against the defendants.

DATED:      March 6, 2022

Respectfully submitted,

/s/ Joseph G. Makowski, Esq